UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

Tammy Zokaitis,

     Plaintiff,

     v.                                                        Civil Action No. 1:10-CV-30

Michael J. Astrue,
Commissioner of Social Security,

     Defendant.

## REPORT AND RECOMMENDATION
(Docs. 5, 11)

Claimant Tammy Zokaitis brings this action pursuant to 42 U.S.C. § 405(g) of the Social Security Act, requesting review and reversal of the decision of the Commissioner of Social Security ("Commissioner") denying her application for disability insurance benefits and supplemental security income.  Pending before the Court are Zokaitis's Motion seeking an order reversing the Commissioner's decision or remanding for further proceedings (Doc. 5), and the Commissioner's Motion seeking an order affirming the same (Doc. 11).

For the reasons explained below, I recommend that Zokaitis's Motion (Doc. 5) be DENIED, and the Commissioner's Motion (Doc. 11) be GRANTED.

## Factual Background

**A.   Non-Medical Evidence**

Zokaitis was born on November 28, 1969, and was thirty-two years old on the alleged disability onset date.  (Administrative Record ("AR") 22, 112.)  She obtained a high school diploma and briefly served in the military.  (AR 34, 106, 139.)  According to Zokaitis, she suffered from abuse by her father and other family members as a child.  (AR 151, 303.)  She is the primary caregiver for her three children, born in 1994, 2002, and 2006.  (AR 113.)  Zokaitis applied for disability insurance benefits ("DIB") and supplemental security income ("SSI") based upon diagnoses of urticaria,[1] which is a skin disorder resulting in chronic hives, and various psychological disorders.  (AR 106-118.)

### i.   Urticaria

Zokaitis reportedly first felt symptoms of urticaria in 1999 while she was employed assembling playpens for Vermont Juvenile Factories.  (AR 23.)  She contends that any work involving repetitive motions causes her hands to swell to such a degree that she is unable to do the job by the end of the day.  (AR 23-24.)  She maintains that "pressure" and "doing the same thing over and over" cause her to break out and to experience painful swelling, itching, burning, and blistering.  (AR 25-26.)  She testified at her hearing before the ALJ that, upon extreme swelling, she remains unable to use her hands for approximately two weeks.  (AR 26-27.)  Zokaitis further testified that she recently mowed her yard for fifteen minutes, but had to stop due to her symptoms.  (AR

---

[1] Urticaria is defined as "[a]n eruption of itching wheals, coll[o]quially called hives, usually of systemic origin; it may be due to a state of hypersensitivity to foods or drugs, foci of infection, physical agents (heat, cold, light, friction), or psychic stimuli."  STEDMAN'S MEDICAL DICTIONARY 2077 (28th ed. 2006).

27.)  She also stated, however, that she is able to perform household chores daily for limited periods of time including dusting and vacuuming, and can rake leaves for up to thirty minutes.  (AR 28, 146.)  At her July 22, 2009 hearing, the ALJ observed that, though Zokaitis claimed that she was often unable to wear rings on her hands due to her condition, she was wearing rings that day.  (AR 35.)

### ii.  Psychological Disorders

In addition to physical limitations allegedly caused by her urticaria, Zokaitis contends that she suffers from several psychological disorders, including "[b]ipolar [disorder], . . . ADHD and . . . high anxieties and deep depression, and . . . agoraphobia.[2]" (AR 29.)  She reports that her symptoms involve excessive sweating, rapid pulse, difficulty concentrating, and fear of leaving the house.  (AR 29-30.)  She further reports that her psychological disorders cause her difficulty in relating to others, irritability, and inability to deal with stress.  (AR 31-32.)

### iii.  Daily Life

In December 2006, Zokaitis reported that her usual day entails preparing two children for school in the morning and caring for the youngest at home, along with cooking, cleaning, and completing other household chores.  She further reported that she bathes the children and helps them with homework and school projects as needed.  (AR 144.)  According to Zokaitis, she is able to complete most household chores on a daily basis, but she often suffers breakouts resulting in itching, burning, swelling, and

---

[2]  Agoraphobia is defined as "[a] mental disorder characterized by an irrational fear of leaving the familiar setting of home, or venturing into the open, so pervasive that a large number of external life situations are entered into reluctantly or are avoided."  STEDMAN'S MEDICAL DICTIONARY, *supra at* 40.

blistering because of her skin disorders.  (AR 146.)  She can drive a car and go into smaller stores independently, but states that she will not go to larger stores because she suffers from "anxiety and panic attacks" and that she "can't deal with . . . [a] large group of people [or] lines."  (AR 147.)  She further reported that her hobbies include sewing, crochet, sports, and crafts, but that these activities also cause skin breakouts.  (AR 148.) Zokaitis states that she gets along well with authority figures and "treat[s] them with respect," but does not handle stress and changes in routine well.  (AR 150.)  As of August 2007, she reported taking the following medications to treat her various ailments: Geodon, Topomax, Cymbalta, Lunesta, Klonopin, Loratidine, Famotidine, Singulair, and Fexofenadine.  (AR 372, 376.)

### iv.   Work History

Zokaitis's work history includes factory work, cleaning hotel rooms, food service, and working as a retail cashier.  (AR 23, 121.)  She alleges that, from January 15, 2002 until the present, she has been unable to work due to the urticaria and psychological diagnoses.  (AR 133.)  Specifically, she testified that she left her job as a cashier because she kept having breakouts of the urticaria and "couldn't handle it."  (AR 26.)

## B.   Relevant Medical Evidence

### i.   Dr. Peraza- Treating Dermatologist

In October 2001, Zokaitis treated with Jose Peraza, M.D., complaining of itchy skin.  The doctor's notes reflect that the problem "could be urticaria," but that he did not see evidence of it except for the "nonspecific excoriations" on Zokaitis's forearms and legs.  (AR 188.)  Dr. Peraza prescribed topical medication.  (*Id.*)  Zokaitis returned for a

4

follow-up appointment in December 2001.  (*Id.*)  Dr. Peraza's notes reflect that she was "doing quite well," and that "arm, chest and leg examination" was unremarkable, but that she had "mild eczema" on her neck.  (AR 188.)

### ii.    Dr. Cornelius- Treating Primary Care Physician

Zokaitis treated with Chris Cornelius, M.D. for both urticaria and psychological disorders between July 2003 and October 2006.  (AR 227-68.)  On May 27, 2005, Dr. Cornelius diagnosed her with "Anxiety Generalized Disorder," observing that she "has trouble going out in public" and "cries easily."  (AR 234.)  He prescribed Paxil (10mg) and referred her to counseling.  (AR 234.)  Over the course of several months, Dr. Cornelius adjusted Zokaitis's medication types and amounts and added a diagnosis of major depression.  (AR 237-40.)  The doctor's notes from November 29, 2005 indicate that Zokaitis was "[d]oing well with counseling" but "still depressed."  (AR 243.)  Similarly, Dr. Cornelius's notes from December 27, 2005 state that "[c]ounseling is going well," but reflect that Zokaitis "[h]as not been taking the Zoloft reliably.  Misses days at a time. . . . just forgets to take it."  (AR 244.)  On that date, the doctor further observed that Zokaitis "has [a] rash on both hands" that "itches and burns," and added a diagnosis of "urticaria idiopathic."  (*Id.*)  On August 4, 2006, Dr. Cornelius referred Zokaitis to allergist Mark Lazarovich, M.D.

### iii.    Dr. Lazarovich- Treating Allergist

Zokaitis first saw Dr. Lazarovich on August 21, 2006.  The doctor's notes from that visit provide that Zokaitis "seems to have two different type[s of] problems.  One is clearly urticarial . . . .  The second problem[ ] reportedly consists of burning blistering

lesions.  This is not urticarial."  (AR 277.)  The recommended course of treatment was antihistamines.  Zokaitis returned on October 11, 2006, and office notes reflect that her conditions were "unchanged" and that "[h]olding brooms or any other object induces hiving."  (AR 278.)  By November 28, 2006, however, Dr. Lazarovich observed that Zokaitis had "seen some improvement of clearing on her hands."  (AR 279.)  The doctor continued to see Zokaitis regularly in 2007 and 2008, observing on October 8, 2007 that "hiving is much improved on meds" (AR 466), though other visits reflected that her condition was "unchanged" or worse.  (AR 463-68.)  Notes from visits with Dr. Lazarovich also reflect that Zokaitis claimed to have breakouts induced by shaving her legs (AR 467), using a staple gun (AR 468), and shoveling (AR 464).

### iv.     Dr. Dier- Treating Primary Care Physician

Zokaitis saw Douglas Dier, M.D. on August 8, 2007.  His summary note from that visit reflects that Zokaitis "report[ed] at least a ten year history of recurrent urticaria precipitated by pressure and often accompanied by joint pain and swelling."  (AR 372.) Dr. Dier diagnosed Zokaitis with "recurrent pressure induced urticaria with accompanying joint pain."  (*Id.*)

### v.     Janine Small, LICSW- Treating Counselor

Between November 2005 and November 2008, Zokaitis attended counseling sessions regularly with Janine Small, a licensed clinical social worker.  (AR 282-312, 380-92, 401-20, 454-59.)  Small's treatment notes of the sessions vary considerably with respect to assessment of Zokaitis's psychological condition.  On April 12, 2006, Small's treatment notes reflect that Zokaitis "looked well," but that she had reported that her

anxiety level was "severe" and "limiting her from engaging in normal daily activities."
(AR 293.)  On April 20, 2006, Small's notes similarly reflected that Zokaitis's anxiety
and panic "keep her from going out in public."  (AR 294.)  After Zokaitis gave birth to
her third child, Small saw her on September 7, 2006 and again described her as
"look[ing] very well," but noted that Zokaitis stated that she had been "overwhelmed"
and "anxious," and that she was having frequent panic attacks.  (AR 301.)  Small's
treatment notes from October 26, 2006 state that Zokaitis "seemed much brighter today
than I think I've ever seen her."  (AR 303.)  Small similarly wrote on November 9, 2006,
that Zokaitis "continues to appear much less depressed," but that "she continues to have
difficulty with agoraphobia and feeling like she can't comfortably leave the house."  (AR
304.)  Other notes from November 2006 through March 2008 uniformly note that
Zokaitis's general behavior was appropriate, that she appeared well-groomed, and that
she was cooperative and goal-directed.  (AR 380-92.)  These notes also reflect that
Zokaitis's insight and judgment were generally "intact" but occasionally "fair." (AR 380-
92.)

Small's Treating Source Statement of Mental Impairment (AR 454-59)
categorized Zokaitis's restriction of activities of daily living and difficulties in
maintaining social functioning as "extreme" (AR 456) and noted that Zokaitis had "no
useful ability to function" in several of the mental abilities and aptitudes required to do
unskilled work.  (AR 457-58.)  Small's concluding assessment was that Zokaitis's
impairments would cause her to be absent from work more than four days per month.
(AR 458.)

vi.     **Nancy Driscoll, M.S. APRN, B.C.-Treating Psychiatric Nurse Practitioner**

Psychiatric Nurse Practitioner Nancy Driscoll treated Zokaitis regularly between approximately September 2006 and June 2009.  Driscoll's treatment notes reflect that she used Global Assessment Functioning (GAF) as a measure of Zokaitis's psychological health.  (AR 324-30, 365-70, 432-43, 469-77.)  GAF is measured on a numeric scale ranging from zero to one hundred used to rate social, occupational and psychological functioning "on a hypothetical continuum of mental health-illness."  American Psychiatric Association, Diagnostic and Statistical Manual of Mental Disorders ("DSM-IV"), at 30, 32 (4th ed. rev. 2000).  A GAF score of 31 to 40 corresponds to a major impairment in several areas, such as work, family relations, judgment, thinking, or mood. *Id.* at 32.  A GAF score of 41 to 50 corresponds to serious impairment in social or occupational functioning.  *Id.*  An individual has "moderate difficulty" in social or occupational functioning with a GAF score of 51 to 60, and "some difficulty" in these areas but is generally functioning pretty well with a score of 61-70.  *Id.*

On twenty-five occasions, Driscoll assessed Zokaitis's GAF score to be 50 or higher; on two occasions, she assessed it as a 40 (AR 470, 477); and on one occasion, she assessed it as a 45.  (AR 327.)  Driscoll opined that Zokaitis's average GAF score was 52. (AR 444.)  On multiple visits, Driscoll did not employ the GAF.

Driscoll's Treating Source Statement of Mental Impairment (AR 444-49) categorized Zokaitis's restriction of activities of daily living as "none to mild" (AR 446), but assessed her difficulties in maintaining social functioning and other functional

limitations as "extreme." (AR 446.) Driscoll designated many of Zokaitis's mental abilities and aptitudes needed to do unskilled work as either "very good" or "limited but satisfactory." (AR 447-48.) She did not designate anything in this category as "no useful ability to function," other than Zokaitis's ability to "deal with stress of semiskilled and skilled work." (*Id.*) Like Small, Driscoll concluded that Zokaitis's impairments would cause her to be absent from work more than four days per month. (AR 449.)

### vii.    Dr. Reilly– State Agency Consultant (Psychiatry)

After reviewing the records of Driscoll and Small, state agency consultant Thomas Reilly, Ph.D. performed a Mental Residual Functional Capacity Assessment and a Psychiatric Review in March 2007. (AR 332-49.) Dr. Reilly opined that Zokaitis can understand and remember simple task instruction, is "fully coherent," and retains functions "for simple task demands in low stress contexts." (AR 334.) Dr. Reilly further opined that Zokaitis's functioning is "grossly intact" when she follows through with her prescription regimen and cognitive behavioral therapy to address her anxiety. (*Id.*) The doctor also concluded that "[a]side from intense and frequent interaction w[ith] unfamiliar [ ] large groups of individuals, [Zokaitis] is uniformly appropriate, cooperative and without grossly disordered social behavior." (*Id.*) Dr. Reilly's assessments provided that Zokaitis has only mild or moderate functional limitations (AR 346), and he found that Zokaitis's depression-related disorders, while medically determinable, did not satisfy the diagnostic criteria under listing 12.04. (AR 339.) He reached the same conclusion with respect to Zokaitis's anxiety-related disorders in relation to listing 12.06. (AR 341.) *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

9

### viii.   Dr. Cook – State Agency Consultant

After reviewing the records of the above treating professionals, state agency

consultant Francis Cook, M.D. performed a Physical Residual Functional Capacity

Assessment in March 2007.  (AR 350-57.)  Therein, he opined that Zokaitis had no

established exertional limitations as a result of the urtricaria, but that she "needs to be

careful with triggers, i.e. temperature, chemicals, etc."  (AR 351.)  He concluded that

Zokaitis had no established manipulative, communicative, or postural limitations, but that

she should avoid concentrated exposure to extreme heat, fumes, odors, dusts, and gases.

(AR 352-54.)  Dr. Cook observed that Zokaitis's claimed symptoms were credible, but

indicated that she maintained an active daily life, including keeping a household and

raising young children.  (AR 355.)

## Procedural Background

On October 19, 2006, Zokaitis filed applications for Disability Insurance Benefits

and Supplemental Security Income, alleging that she became disabled on January 15,

2002 due to urticaria and psychological disorders.  (AR 39-42, 106-18.)  Her application

was denied initially (AR 61-66), and then denied again upon review by a Federal

Reviewing Official.  (AR 42-49.)[3]  Zokaitis filed a timely request for an administrative

hearing (AR 90-92), which was held by Administrative Law Judge ("ALJ") Robert S.

Klingebiel on July 22, 2009.  (AR 15-38.)  Zokaitis appeared with counsel at the hearing

and testified.

---

[3]  Zokaitis's case was selected at random for a pilot program whereby the Commissioner tests
new procedures in the administrative review process.  *See* 20 C.F.R. § 405.1 (2009).

The ALJ issued a decision on September 8, 2009, concluding that Zokaitis was not disabled under the Social Security Act from the alleged disability onset date through the date of the decision.  (AR 50-60.)  Specifically, the ALJ found that although Zokaitis had the severe impairments of anxiety disorder, affective disorder, and urticaria, she retained the residual functional capacity ("RFC") to perform her past relevant work as a cashier. (AR 55-60.)  The Decision Review Board ("DRB") reviewed the ALJ's decision and issued its own decision on December 11, 2009.  (AR 1-7.)  As explained below, that decision added one additional limitation to Zokaitis's RFC, but similarly concluded that she could perform her past relevant work as a cashier.  (AR 4-7.)  The DRB's decision is the final decision of the Commissioner.  (AR 1.)  Having exhausted her administrative remedies, Zokaitis timely filed the instant action on February 5, 2010.  (Doc. 1.)

## ALJ Decision

### A.   Five-Step Sequential Evaluation Process

The Commissioner uses a five-step sequential process to evaluate disability claims.  *See Butts v. Barnhart*, 388 F.3d 377, 380-81 (2d Cir. 2004).  The first step requires the ALJ to determine whether the claimant is presently engaging in "substantial gainful activity."  20 C.F.R. §§ 404.1520(b), 416.920(b).  If the claimant is not so engaged, step two requires the ALJ to determine whether the claimant has a "severe impairment."  20 C.F.R. §§ 404.1520(c), 416.920(c).  If the ALJ finds that the claimant has a severe impairment, the third step requires him to make a determination as to whether the claimant's impairment "meets or equals" an impairment listed in 20 C.F.R. Part 404, Subpart P, Appendix 1 ("the Listings").  20 C.F.R. §§ 404.1520(d), 416.920(d).

The claimant is presumptively disabled if the impairment meets or equals a listed impairment. *Ferraris v. Heckler*, 728 F.2d 582, 584 (2d Cir. 1984).

If the claimant is not presumptively disabled, the fourth step requires the ALJ to consider whether the claimant's RFC precludes the performance of his or her past relevant work. 20 C.F.R. §§ 404.1520(f), 416.920(f). The fifth and final step requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). The claimant bears the burden of proving his or her case at steps one through four, *Butts*, 388 F.3d at 383, and at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore v. Astrue*, 566 F.3d 303, 306 (2d Cir. 2009) (clarifying that the burden shift to the Commissioner at step five is limited, and the Commissioner "need not provide additional evidence of the claimant's residual functional capacity").

## B.    ALJ Determination

Employing this five-step analysis, in his September 2009 decision, ALJ Klingebiel first determined that Zokaitis has not engaged in substantial gainful activity since her alleged onset date of January 15, 2002. (AR 55.) At step two, the ALJ found that Zokaitis has the following severe impairments: anxiety disorder, affective disorder, and urticaria, which "produce more than minimal reduction in the ability to perform work related activities and, therefore, constitute[ ] . . . medically determinable severe impairments." (AR 55.) At step three, the ALJ found that Zokaitis does not have an impairment or combination of impairments that meets or medically equals a listed impairment. (AR 56.) *See* 20 C.F.R. Part 404, Subpart P, Appendix 1.

Next, the ALJ determined that, despite Zokaitis's impairments, she has the RFC to perform the full range of light work as defined in 20 C.F.R. § 404.1567(b)[4] and 416.967(b), except that she should "avoid environments with extreme heat and airborne irritants and she cannot follow complex instructions or perform complex job tasks."  (AR 57.)

Given this RFC, the ALJ concluded that Zokaitis is capable of performing her past relevant work as a cashier as it is actually and generally performed.  (AR 59.)  Because he concluded that Zokaitis could perform her past work, the ALJ did not make any finding with respect to step five (whether Zokaitis can do any other work), and concluded that Zokaitis was not under a disability from October 19, 2006 through the date of the decision.  (AR 60.)

## C.     DRB Decision

In its decision, the DRB adopted most of the ALJ's findings, but disagreed in part with the ALJ's interpretation of the opinion of non-examining state agency psychological consultant Thomas Reilly, Ph.D.  (AR 4-5.)  Although the DRB agreed with the ALJ that Dr. Reilly's opinion is "entitled to significant weight," it stated that the ALJ "did not include in the decision Dr. Reilly's opinion regarding the claimant's marked limitations in her ability to engage in frequent and intense interaction with large unfamiliar groups of

---

[4] 20 C.F.R. § 404.1567(b) provides as follows: "Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds.  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls."  Additionally, the Second Circuit has stated that "[t]he full range of light work requires intermittently standing or walking for a total of approximately 6 hours of an 8-hour workday, with sitting occurring intermittently during the remaining time."  *Poupore*, 566 F.3d at 305.

people." (*Id.*)  Accordingly, the DRB added this limitation, but still ultimately concluded that Zokaitis's RFC was "consistent with the requirements of [her] past relevant work as a cashier, as she described it and as it is performed in the national economy, which required working with individual customers rather than large unfamiliar groups of people." (AR 5.)

## Standard of Review

The Social Security Act defines the term "disability" as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A).  A person will be found to be disabled only if it is determined that his "impairments are of such severity that he is not only unable to do his previous work[,] but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

In reviewing a Commissioner's disability decision, the court limits its inquiry to a "review [of] the administrative record *de novo* to determine whether there is substantial evidence supporting the . . . decision and whether the Commissioner applied the correct legal standard." *Machadio v. Apfel*, 276 F.3d 103, 108 (2d Cir. 2002) (citing *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000)); *see* 42 U.S.C. § 405(g).  A court's factual review of the Commissioner's decision is limited to determining whether "substantial evidence" exists in the record to support such decision.  42 U.S.C. § 405(g); *Rivera v.*

*Sullivan*, 923 F.2d 964, 967 (2d Cir. 1991).  "Substantial evidence" is more than a mere scintilla; it means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.  *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *Consol. Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938); *Poupore*, 566 F.3d at 305.

The reviewing court's role with respect to the Commissioner's disability decision is "'quite limited[,] and substantial deference is to be afforded the Commissioner's decision.'"  *Hernandez v. Barnhart*, No. 05 Civ. 9586, 2007 WL 2710388, at *7 (S.D.N.Y. Sept. 18, 2007) (quoting *Burris v. Chater*, No. 94 Civ. 8049, 1996 WL 148345, at *3 (S.D.N.Y. Apr. 2, 1996)).  The court should not substitute its judgment for that of the Commissioner.  *Yancey v. Apfel*, 145 F.3d 106, 111 (2d Cir. 1998).  The Second Circuit explained: "The entire thrust of judicial review under the disability benefits law is to ensure a just and rational result between the government and a claimant, without substituting a court's judgment for that of the Secretary, and to reverse an administrative determination only when it does not rest on adequate findings sustained by evidence having 'rational probative force.'"  *Williams v. Bowen*, 859 F.2d 255, 258 (2d Cir. 1988) (quoting *Consol. Edison Co.*, 305 U.S. at 230).

Therefore, if the reviewing court finds substantial evidence to support the Commissioner's final decision, that decision must be upheld, even if substantial evidence supporting the claimant's position also exists.  *See Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990); *DeChirico v. Callahan*, 134 F.3d 1177, 1182-83 (2d Cir. 1998).

## Analysis

**A.    The ALJ's Finding that Zokaitis Could Return to Her Past Relevant Work as a Cashier**

Zokaitis asserts that substantial evidence does not support the ALJ's finding at step four in the sequential process that she could return to her past relevant work as a cashier.  Specifically, she contends that the ALJ failed to consider evidence in the record, including (i) Zokaitis's own statements; (ii) treatment notes from her providers; and (iii) a "low stress setting" limitation noted by state agency physician Dr. Reilly.  (Doc. 5 at 3-6.)  She also argues that the ALJ should have limited her to jobs with a reasoning level of one under the Dictionary of Occupational Titles ("DOT") (Doc. 5 at 6), and that the DRB's determination that Zokaitis's past work as a cashier did not involve frequent and intense interaction with large groups of people is unsupported by substantial evidence. (Doc. 5 at 7.)  As noted earlier, it is the claimant's burden to show that she is incapable of performing her past relevant work.  *Bapp v. Bowen*, 802 F.2d 601, 604 (2d Cir. 1986).  In order to make this showing, the claimant must demonstrate not only an inability to return to her previous specific job, but also an inability to perform her past relevant work generally.  *Jasinski v. Barnhart*, 341 F.3d 182, 185 (2d Cir. 2003).  I address each argument below.

### i.    Zokaitis's Statements

Zokaitis contends that the ALJ failed to consider her subjective accounts of her limitations.  (Doc. 5 at 5.)  Her contention that the ALJ ignored these subjective accounts is simply unfounded.  In Zokaitis's Disability Report, she stated that the illnesses,

injuries, or conditions that limit her ability to work include "post tra[u]matic stress disorder, panic disorder, depression, idiopathic urticaria, dermatographism, ex[c]ema/dermatitis" and that "everything [I] touch [I] break out."  (AR 133.)  When asked how the conditions limit her ability to work she stated "when I get [breakouts] very bad they blister and swell I have to be careful of what I do, . . . cleaning etc because I'm so sens[i]tive to chemicals and other products."  (*Id.*)  At the hearing before the ALJ, Zokaitis testified that, while she was working as a cashier, waiting on customers, doing cleaning and closing the store, she would have urticarial breakouts.  Her hands would "swell, or get itchy and . . . burn . . . and then it would start blister[ing] . . . and my hand would be really swollen.  (AR 26.)

> The ALJ found that:
>
> The claimant's symptomatic complaints are characterized in her hearing testimony and in the evidence of record by allegations of post traumatic stress disorder, panic disorder, agoraphobia, depression, idiopathic urticaria, dermatographism, contact dermatitis manifested by her skin breaking out in rashes, blisters, bumps, welts, swelling and hives, sensitivity to chemicals and right foot tendonitis and plantar fasciitis with pain.  After careful consideration of the evidence, the undersigned finds that the claimant's medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, the claimant's statements concerning the intensity persistence and limiting effects of those symptoms are not credible to the extent they are inconsistent with the . . . [RFC].

(AR 58.)  The ALJ's summary of symptoms is taken nearly verbatim from Zokaitis's own descriptions of her conditions in documents in the record and in her hearing testimony.  The ALJ not only considered these statements, but adopted them and found that Zokaitis's medically determinable impairments could reasonably be expected to

cause her symptoms.  Thus, substantial evidence in the record supports that the ALJ

considered Zokaitis's statements about her conditions in reaching his determination that

she can perform her past relevant work.  To the extent Zokaitis argues that the ALJ erred

in his credibility determination regarding Zokaitis's account of her symptoms' intensity,

persistence, and limiting effects, this issue is addressed in section C below.

### ii.      Provider Evidence of Urticaria

Zokaitis next argues that the ALJ erred by failing to give appropriate weight to the

treatment notes of Drs. Lazarovich, Dier, and Peraza who treated her for urticaria.  In her

reply brief, she also argues that these doctors' treatment notes regarding a diagnosis of

pressure urticaria should have resulted in an RFC limitation upon manipulative activities,

including handling or fingering.  (Doc. 12 at 2.)

While the ALJ did not refer to the treatment notes of these doctors by name in his

written decision, his decision shows that he considered them.  Specifically, the ALJ noted

that his finding that Zokaitis's urticaria was a severe impairment was "based upon the

objectively documented clinical signs and findings and the treating physician notes and

opinions described in the medical evidence of record."  (AR 55.)  Neither Drs.

Lazarovich, Dier, nor Peraza conducted any testing or specifically opined as to how

Zokaitis's symptoms of urticaria affected her ability to work.  Rather, their notes, in large

part, recorded Zokaitis's subjective complaints.

In any event, upon review of the records in detail, treatment notes from Drs.

Peraza and Lazarovich suggest that Zokaitis's skin condition can be controlled with

appropriate medication.  (AR 188, 279, 464, 466.)  For example, Dr. Peraza prescribed

topical medications for Zokaitis's urticarial symptoms and eight weeks later observed
that she was "doing quite well" and that Zokaitis's follow-up arm, leg, chest
examinations were "unremarkable." (AR 188.) Similarly, Dr. Lazarovich's notes from
November 2006 state that Zokaitis had "some improvement of clearing on her hands" and
that her idiopathic urticaria had "[i]mproved." (AR 279.) Dr. Lazarovich's notes from
February 2008 also state that Zokaitis's idiopathic urticaria and her pressure urticaria had
"[i]mproved" (AR 464) and his notes from October 2007 state explicitly that Zokaitis's
"hiving is much improved on meds." (AR 466.)

Dr. Lazarovich's notes reflect that Zokaitis reported breakouts caused by holding a
broom, raking, and using a staple gun. (AR 464, 468, 228.) However, Dr. Lazarovich
did not perform any objective tests to assess whether Zokaitis's ability to do these tasks
or other light work was adversely affected by her condition. The only physician who
opined on the limitations caused by Zokaitis's urticaria was state agency physician Dr.
Cook, who reviewed the evidence in the record and completed an RFC. In the RFC, he
indicated that Zokaitis should avoid exposure to chemicals, extreme heat, fumes odors,
dusts, gases, and poor ventilation. (AR 351, 354.) The ALJ credited Dr. Cook's opinion
and included these limitations in his RFC finding. (AR 57, 59.) Thus, the ALJ
considered evidence in the record of Zokaitis's pressure and idiopathic urticaria from
both her treating physicians and the state agency consultant, including the documented
effects of her condition upon her ability to work. The ALJ's conclusion that these
conditions do not preclude her from performing her past work as a cashier is supported
by substantial evidence.

Finally, Zokaitis argues that the ALJ erred at step two in the sequential process by failing to state explicitly that Zokaitis suffered from both pressure urticaria and idiopathic urticaria.  As noted above, the ALJ found at step two that Zokaitis had the impairment of urticaria, and that it was a medically determinable severe impairment.  (AR 55.) Accordingly, the ALJ's determination at step two was actually favorable to Zokaitis, and, in any event, was in accordance with the applicable legal standard and is supported by substantial evidence.  *See Hussnatter v. Astrue*, No. CV-09-3261 (SJF), 2010 WL 3394088, at *19 (E.D.N.Y. Aug. 20, 2010).

### iii.    Low Stress Setting Limitation

Zokaitis next argues that the Commissioner erred by failing to include a low stress setting limitation in her RFC, as recommended by state agency consultant Dr. Reilly. (Doc. 5 at 6; Doc. 12 at 2-3; AR 334.)  In support of this argument, Zokaitis cites to Social Security Ruling 85-15, which provides that "[t]he reaction to the demands of work (stress) is highly individualized, and mental illness is characterized by adverse responses to seemingly trivial circumstances," and that "[a]ny impairment-related limitations created by an individual's response to demands of work . . . must be reflected in the RFC assessment."  SSR 85-15, 1985 WL 56857, at *6.

Dr. Reilly noted in his mental RFC assessment that Zokaitis retained the capacity to understand and remember simple task instructions and simple task demands "in low stress contexts."  (AR 334.)  While the ALJ did not refer to Dr. Reilly's particular statement regarding "low stress contexts," he did credit Dr. Reilly's opinion generally in determining that Zokaitis was capable of performing her past relevant work as a cashier.

(AR 59.)  The ALJ opined that Zokaitis's cashier work "does not require the performance of work-related activities precluded by [her] residual functional capacity," and "does not involve performing tasks that would be restricted by [her] non exertional limitations." (*Id*.)  Work-related activities precluded by Zokaitis's RFC include activities that are high stress, according to Dr. Reilly's assessment.  Similarly, performing tasks that would be restricted by Zokaitis's non-exertional limitations include tasks in a high stress setting. Thus, although the ALJ's analysis may have been somewhat general, he did consider Dr. Reilly's low stress context limitation in reaching his determination that she could return to her past work.  The ALJ simply concluded, given the evidence in the record, that her past work would be consistent with such a limitation.

Zokaitis has not met her burden of showing that she is incapable of performing her past relevant work.  She does not argue or demonstrate that her past work as a cashier involved stressful contexts.  Indeed, her own statements regarding her past work support an inference that the job was low stress.  Specifically, Zokaitis described her past cashier work as "customer service, cleaning, cash out, close store" (AR 122), "weekly orders and inventory, daily deposits, open and close store" (AR 123), and "mak[ing] grinders."  (AR 124.)  She noted that she was not required to use technical knowledge or skills, do any writing, be a lead worker, or complete reports.  (AR 122.)  At two of her three cashier positions, she was not required to supervise other employees.  (AR 122- 26.)  In short, the ALJ's determination that Zokaitis could return to her past relevant work as a cashier is supported by substantial evidence, and the ALJ's failure to specifically include reference to Dr. Reilly's low-stress context limitation does not compel a different conclusion.

Furthermore, I note that the ALJ's presumptive characterization of cashier work as accommodating of a low stress context limitation is consistent with decisions of other jurisdictions under similar circumstances. *See, e.g.*, *Foglesong v. Sec'y of Health and Human Servs.*, 19 F.3d 1432, 1432 (6th Cir. 1994) ("Assuming a person with [the claimant]'s . . . mental limitations, . . . [the testifying expert] concluded that she could perform a large number of low-stress . . . occupations, such as cashier . . . ."); *Blackmon v. Astrue*, No. 04-1347 (CKK), 2010 WL 2607215, at *14-15 (D.D.C. June 30, 2010) (concluding that, despite a low stress setting RFC limitation, claimant could perform the job of a cashier); *Iles v. Astrue*, No. H-H-09-2861, 2010 WL 2574229, at *2 (S.D. Tex. June 25, 2010); *Kendrick v. Barnhart*, No. 1:04CV0292DFHTAB, 2005 WL 1025777, at *10- 11 (S.D. Ind. Apr. 18, 2005) (same).

Finally, Zokaitis contends that the ALJ's "fail[ure] to discuss stress" compels the Court to remand her case, relying on the Third Circuit's reasoning in *Allen v. Barnhart*, 417 F.3d 396, 407 (3d Cir. 2005). (Doc. 12 at 3.) *Allen* is inapposite to the circumstances of this case, however, because the remand in that case arose out of the ALJ's failure to address a low stress limitation at step five, which requires the ALJ to determine whether the claimant can do "any other work." 20 C.F.R. §§ 404.1520(g), 416.920(g). It bears repeating that the claimant bears the burden of proving his or her case at steps one through four; *Butts*, 388 F.3d at 383, while at step five, there is a "limited burden shift to the Commissioner" to "show that there is work in the national economy that the claimant can do," *Poupore*, 566 F.3d at 306. Therefore, Zokaitis bears the burden of proving her case at step four, requiring her to demonstrate that she cannot

perform her past work as a cashier.  She failed to establish that her past work was not a

low stress setting, and there is substantial evidence in the record supporting the ALJ's

conclusion that she can return to it despite her diagnoses.

### iv.     DOT Reasoning Level

Zokaitis argues that the Commissioner erred by failing to consider designated

reasoning levels under the DOT when determining that she was capable of returning to

her past work as a cashier.  Under the DOT Components of the Definition Trailer, a

reasoning level of 1 is defined as the ability to "apply commonsense understanding to

carry out simple one or two-step instructions" and to "[d]eal with standardized situations

with occasional or no variables in or from these situations encountered on the job."  U.S.

Dep't of Labor, *Dictionary of Occupational Titles* Appx. C (4th ed. 1991), 1991 WL

688702.  A reasoning level of 3 is defined as the ability to "[a]pply commonsense

understanding to carry out instructions furnished in written, oral, or diagrammatic form"

and to "[d]eal with problems involving several concrete variables in or from standardized

situations."  *Id.*  Zokaitis contends that Dr. Reilly's assessment that she "retains

[concentration, persistence, and pace] functions for simple task demands in low stress

contexts" (AR 334) means that she has a reasoning level of only 1, as defined under the

DOT.  Because a cashier demands a reasoning level of 3, Zokaitis asserts, she is not able

to do this job.  I find several flaws with this argument.

As an initial matter, nothing in the record specifically designates Zokaitis's DOT

reasoning level as 1.  This is her characterization of the evidence, not the ALJ's.  While

the evidence may support the inference that Zokaitis may have a reasoning level of 1, it

does not necessarily follow that she is incapable of performing her past work as a cashier simply because the DOT assigns cashier work, in the abstract, a reasoning level of 3. This Court and other jurisdictions have concluded that "the 'definitional requirements' for the jobs listed in the DOT are merely advisory in nature and serve only as a reference for the ALJ." *Warf v. Shalala*, 844 F. Supp. 285, 289 (W.D. Va. 1994); *Beatty v. Astrue*, No. 2:08-CV-86, slip op. at 22-24 (D. Vt. Feb. 11, 2009) (Conroy, Mag. J.); SSR 00-4p ("The DOT lists maximum requirements of occupations as generally performed, not the range of requirements of a particular job as it is performed in specific settings."). *See also Wheeler v. Apfel*, 224 F.3d 891, 897 (8th Cir. 2000) (noting that DOT definitions "are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range") (quoting *Hall v. Chater*, 109 F.3d 1255, 1259 (8th Cir. 1997)); *Conn v. Sec'y of Health & Human Servs.,* 51 F.3d 607, 610 (6th Cir. 1995). The issue before the Court is whether there is substantial evidence to support the ALJ's decision that Zokaitis can return to her past relevant work as a cashier, not whether she can perform work at a reasoning level of 3.

As noted earlier, Zokaitis described her past cashier work on her work history report as "customer service, cleaning, cash out, close store" (AR 122), "weekly orders and inventory, daily deposits, open and close store" (AR 123), and "mak[ing] grinders" (AR 124). She noted that she was not required to use technical knowledge or skills, do any writing, or complete reports. (AR 122.) Though Zokaitis stated that her conditions first bothered her in 1999, she acknowledged that she worked until 2002 without having

24

to work fewer hours, change her job duties, or "make any job-related changes such as attendance, help needed, or employers."  (AR 133.)

Nothing in the record indicates that Zokaitis's conditions have changed significantly since she first became affected by them.  To the contrary, treatment records suggest that they improved when controlled by appropriate medications and treatment regimen.  In particular, Counselor Small observed on several occasions that Zokaitis was looking "well" or "very well" (AR 290, 293, 301, 386), that she "seemed much brighter today than I think I've ever seen her" (AR 303), and that Zokaitis "continues to appear much less depressed."  (AR 304.)  Small's notes from other sessions indicate Zokaitis was having success with improved communication skills with family members, including specific examples of setting appropriate limits and boundaries with them on multiple occasions.  (AR 285, 286, 288, 289, 290.)  Small's notes also reflect Zokaitis's general progress, in some cases deeming it "significant" (AR 303), state that Zokaitis had several "productive" sessions (AR 296, 297, 299, 381), and that Zokaitis experienced lower stress and anxiety levels with appropriate medications and regular attendance at therapy sessions.  (AR 302, 304, 380, 383, 386.)  Accordingly, there is substantial evidence in the record supporting the ALJ's determination that Zokaitis can perform her past relevant work as a cashier as she actually performed it.

Other jurisdictions have reached similar conclusions under comparable factual circumstances.  For example, in *Hillier v. Social Security Administration*, 486 F.3d 359 (8th Cir. 2007), the claimant suffered from "borderline intellectual functioning," myofacial pain, osteoarthritis, hypertension, stress incontinence, and blurred vision,

among other conditions. *Id.* at 362. Her work history included working at Wendy's and working as a cashier at the Salvation Army. *Id.* The state agency consultant opined that Hillier was able to "understand, remember, and follow very short and simple instructions," *id.* at 363, and a vocational expert testified that Hillier could work as a cashier, *id.* at 366. Based upon this evidence as well as other evidence in the record, the ALJ found that Hillier could "understand, remember, and follow concrete instructions," and limited her to "simple, concrete work, either unskilled or semiskilled," *id.* at 365, concluding that Hillier could work as a cashier, *id.* at 364.

On appeal, Hillier argued, much like Zokaitis, that because working as a cashier requires a reasoning level of 3, the ALJ's conclusion was inconsistent with his finding that she was limited to understanding, remembering, and following concrete instructions. *Id.* at 366. The Eighth Circuit reasoned:

> An ALJ cannot rely on expert testimony that conflicts with the job classifications in the [DOT] unless there is evidence in the record to rebut those classifications. The [DOT] definitions are simply generic job descriptions that offer the approximate maximum requirements for each position, rather than their range. Not all of the jobs in every category have requirements identical to or as rigorous as those listed in the DOT.

*Id.* at 366-67 (brackets, internal quotations and citations omitted).

Stating that the issue before the court was "whether Hillier- who can understand, remember, and follow simple concrete instructions – can work as a cashier," the Eighth Circuit concluded that there was substantial evidence supporting the ALJ's conclusion that she could. The court noted that Hillier had previously worked as a cashier, and that there was no evidence of deterioration since she left that work. *Id.* at 367. As in *Hillier*,

the issue is whether Zokaitis can perform her past work as a cashier.  Because I find that there is substantial evidence in the record supporting the ALJ's determination that she can perform her past work, the fact that she may be limited to a reasoning level of 1, in general, does not compel a different result in this case.  *See Terry v. Astrue*, 580 F.3d 471, 478 (7th Cir. 2009) (ruling that a claimant limited to simple work could perform a job with a reasoning level of three where claimant had finished high school, completed further education to become a certified nurse's assistant, and had the cognitive capacity to follow simple instructions); *Renfrow v. Astrue*, 496 F.3d 918, 921 (8th Cir. 2007) (ruling that a claimant unable to perform complex work could perform jobs with a reasoning level of three); *Marshall v. Barnhart*, No. 01-2211, 2002 WL 32488432, at *10 (D. Md. Sept. 27, 2010) (finding that a claimant limited to simple, repetitive, one-two-three step tasks could perform job with a reasoning level of three where there was no evidence in the record that claimant lacked the "common sense" required to perform job).

Although Zokaitis points to decisions of other courts which she contends support her claim, all of these decisions are distinguishable.  Notably, these decisions all involved disputes arising from the fifth and final step in the ALJ's analysis, that is, whether the claimant can do "any other work,"  20 C.F.R. §§ 404.1520(g), 416.920(g), whereas here, Zokaitis disputes the ALJ's determination with respect to step four, whether her RFC precludes the performance of her past relevant work.  20 C.F.R. §§ 404.1520(f), 416.920(f).  As discussed above, the claimant bears the burden of proving his or her case at steps one through four, and at step five, the burden shifts to the Commissioner to show that there is work in the national economy that the claimant can do.

In her reply brief (Doc. 12 at 5-6), Zokaitis advances a similar argument based upon descriptions of cashier work in the Bureau of Labor Statistics' Occupational Outlook Handbook ("OOH"). Zokaitis contends these descriptions of work she contends are "clearly beyond 'simple tasks'" (*id.* at 6), and accordingly, evidence that she cannot return to her past work as a cashier. Under the same reasoning employed above, I find this argument lacks merit. The Court must determine only whether substantial evidence supports the ALJ's determination that Zokaitis can perform her past work as a cashier, not whether she is capable of performing all tasks described in the OOH.

###### v.      Past Work as a Cashier and Interaction with Large Groups of People

Next, Zokaitis contends that, because she is unable to interact with large groups of people, she cannot return to her past work as a cashier. Citing to the OOH descriptions of the nature of cashier work, Zokaitis argues that the cashier position would require her to interact with large, unfamiliar groups of people. The DRB reasoned that, as she described her past work, Zokaitis would only have to interact with individual customers, and that she would not have to interact with large unfamiliar groups of people. (AR 5.) The DRB also noted that individual customer interaction is consistent with the DOT 211.462-10 description of cashier work. (*Id.*); *see* DOT, *supra* at 211.462-10. Substantial evidence supports the DRB's determinations.

In describing her past cashier work, Zokaitis did not provide any indication that she was ever required to interact with large groups of people. (AR 134-35.) In addition, the DOT entry for cashier work establishes that a cashier need only deal tactfully and courteously with customers during individual transactions. DOT, *supra* at 211.462-10.

Accordingly, substantial evidence supports the ALJ's determination that Zokaitis's limited ability to interact with large groups of people does not preclude her from performing her past relevant work as a cashier.

**B.      The ALJ's Consideration of Counselor Small's and Nurse Driscoll's Treating Source Statements of Mental Impairment**

Next, Zokaitis argues that the ALJ erred by failing to give sufficient weight to the Treating Source Statements of Mental Impairment submitted by Janine Small, LICSW (AR 454-59) and Nancy Driscoll, M.S. APRN, B.C. (AR 444-49), Zokaitis's treating mental health professionals.  (Doc. 5 at 8-12.)  Specifically, Zokaitis contends that, pursuant to 20 C.F.R. § 416.927(d), the ALJ should have given the opinions of Driscoll and Small greater weight as treating sources having a "longitudinal picture of [her] impairment[s]."  (Doc. 5 at 11); 20 C.F.R. § 416.927(d).

In determining whether a claimant is disabled, the ALJ considers evidence from (1) acceptable medical sources; and (2) other sources, which include non-acceptable medical sources.  *See* 20 C.F.R. §§ 404.1513, 416.913.  Acceptable medical sources include licensed physicians and licensed or certified psychologists, *see* 20 C.F.R. §§ 404.1513(a), 416.913(a), whereas "other sources" include other types of medical sources as well as non-medical sources, *see* 20 C.F.R. §§ 404.1513(d), 416.913(d).  Only acceptable medical sources can be considered treating sources potentially entitled to controlling weight.  *See* 20 C.F.R. §§ 404.1527(d)(2), 416.927(d)(2).  Zokaitis does not argue that the ALJ should have given Driscoll's and Small's opinions controlling weight

as acceptable medical sources; she argues only that the ALJ should have given these opinions greater weight.  (Doc. 5 at 8-12.)

The ALJ assessed Driscoll's and Small's Treating Source Statements in the context of the other evidence to determine what weight to afford them, as he was required to do.  *See* 20 C.F.R. §§ 416.927(b) ("In deciding whether you are disabled, we will always consider the medical opinions in your case record together with the rest of the relevant evidence we receive."), (d)(4) ("Generally, the more consistent an opinion is with the record as a whole, the more weight [the SSA] will give to that opinion.").  The ALJ declined to give Driscoll's and Small's Treating Source Statements significant weight "because the limitations embodied in each of those assessments are not consistent with and are out of proportion to the objective findings of progress documented in each source's treatment progress notes."  (AR 59.)  A comparison of Driscoll's and Small's Treating Source Statements of Mental Impairment with their respective treatment progress notes, reveals that the ALJ's conclusions regarding their inconsistencies are supported by substantial evidence.

Specifically, in Driscoll's statement, she described her clinical findings as "[high] anxiety, insomnia, difficulty getting up in a.m., [low] concentration, mood swings, [low] focus, [and] unpredictable panic attacks."  She stated that Zokaitis's average GAF score, presumably calculated based upon an average of scores from progress notes, was 52. (AR 444.)  Although a score of 52 corresponds to moderate difficulty in areas of social functioning, DSM IV, *supra* at 32, under "Functional Limitation" on the Treating Source Statement, Driscoll checked that Zokaitis had "extreme" difficulties in maintaining social

functioning.  (AR 446.)  In addition, Driscoll's progress notes reflect that she assessed Zokaitis's "thought form" nearly always as "goal directed" and her attitude as uniformly cooperative.  By contrast, Driscoll's Treating Source Statement provided that Zokaitis had a substantial loss of ability to function in the area of setting realistic goals or making plans independently of others (AR 448), and designated Zokaitis's symptoms as including "blunt, flat or inappropriate affect." (AR 445.)

Small's statement described her clinical findings as "moderate-severe symptoms-PTSD," "mood swings-excessive anxiety and depression."  (AR 454.)  She listed Zokaitis's treatment as "psychoeducation, cognitive behavioral therapy, communication and interpersonal skills," and Zokaitis's response/progress as "fair-poor."  (AR 454.) This "fair-poor" progress is inconsistent with Small's progress notes observing on several occasions that Zokaitis in fact looked "well" or "very well" (AR 290, 293, 301, 386), that she "seemed much brighter today than I think I've ever seen her" (AR 303), and that Zokaitis "continues to appear much less depressed."  (AR 304.)  Progress notes from other sessions indicate Zokaitis was having success with improved communication skills with family members, including specific examples of setting appropriate limits and boundaries with them on multiple occasions.  (AR 285, 286, 288, 289, 290).  Small's notes also reflect Zokaitis's general progress, in some cases deeming it "significant." (AR 303.)  Small's notes further indicate that Zokaitis had several "productive" sessions (AR 296, 297, 299, 381), and that Zokaitis experienced lower stress and anxiety levels with appropriate medications and regular attendance at therapy sessions.  (AR 302, 304, 380, 383, 386.)

Also noteworthy are inconsistencies between Driscoll's and Small's respective assessments and Zokaitis's own statements about her functional abilities.  For example, Driscoll and Small both assessed that Zokaitis has a substantial loss of ability to function in the area of accepting instructions and responding appropriately to criticism from supervisors.  By contrast, Zokaitis's own statement provided that she responds appropriately to authority by "treat[ing] them with respect."  (AR 150.)  This conflict further supports the ALJ's decision to afford little weight to the Treating Source Statements.

While Driscoll's and Small's Treating Source Statements may be consistent in some ways with their progress notes, the Court cannot say that the ALJ erred in deciding not to give the Treating Source Statements significant weight.  Such conflicts in evidence are properly entrusted to the Commissioner, not the Court, to resolve.  *See Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002).

Finally, I recommend that the Court decline to accept Zokaitis's contention that she should be deemed unable to work "based solely on consideration of her GAF scores." (Doc. 5 at 9.)  While she describes her scores over 50 as being "intermittent," as noted above, Driscoll listed her average GAF score as 52 (AR 444), corresponding to only moderate difficulty in areas of social functioning.  In any event, Zokaitis points to no authority, and the Court knows of none, establishing that the ALJ must automatically deem a claimant disabled based solely upon a particular GAF score.  Indeed, this Court has concluded otherwise.  *Beckley v. Astrue*, No. 2:06-CV-20, slip op. at 11-12 (D. Vt. May 12, 2009) (Niedermeier, Mag. J.) ("While a low GAF score may be evidence of

severe limitations of daily functioning, it is only one factor in determining an individual's ability to perform substantial gainful activity."). Authority in other jurisdictions **also** supports a contrary conclusion. *See, e.g.*, *Jones v. Astrue*, No. 09-3263, 2010 WL 3396835, at *8 (8th Cir. Aug. 31, 2010) (affirming denial of disability benefits to applicant with GAF scores in mid-40s and lower 50s and discussing relevance of GAF scores).

**C.     The ALJ's Credibility Determination Regarding Zokaitis's Subjective Complaints**

Finally, Zokaitis argues that the ALJ erroneously found that her subjective complaints of disabling symptoms were not entirely credible. (Doc. 5 at 12-14.) Specifically, she contends that the ALJ failed to evaluate her credibility in a manner consistent with 20 C.F.R. § 404.1529(c)(3). (Doc. 5 at 12.) This regulation explains that, in determining disability, the SSA evaluates symptoms, including pain, by considering not only objective medical evidence, but also by considering "any other information [the claimant] may submit about [her] symptoms." 20 C.F.R. § 404.1529(c)(3). Examples of information a claimant might submit include: the claimant's daily activities; the location, duration, frequency, and intensity of pain or other symptoms; precipitating and aggravating factors; the type, dosage, effectiveness, and side effects of medications the claimant may take to alleviate pain or other symptoms; treatment other than medication that the claimant receives for relief of pain or other symptoms; any measures the claimant may use to relieve pain or other symptoms (e.g., lying flat on back, standing for 15 to 20

minutes every hour, sleeping on a board, etc.); and other factors concerning functional limitations and restrictions due to pain or other symptoms. *Id.*

When determining a claimant's RFC, the ALJ is required to take the claimant's reports of pain and other limitations into account, 20 C.F.R. § 416.929; *see McLaughlin v. Sec'y of Health, Educ. & Welfare*, 612 F.2d 701, 704-05 (2d Cir.1980), but is not required to accept the claimant's subjective complaints without question. The ALJ may exercise discretion in weighing the credibility of the claimant's testimony in light of the other evidence in the record. *Marcus v. Califano*, 615 F.2d 23, 27 (2d Cir.1979).

The regulations provide a two-step process for evaluating a claimant's assertions of pain and other limitations. At the first step, the ALJ must decide whether the claimant suffers from a medically determinable impairment that could reasonably be expected to produce the symptoms alleged. 20 C.F.R. § 404.1529(b). That requirement stems from the fact that subjective assertions of pain alone cannot ground a finding of disability. 20 C.F.R. § 404.1529(a); *Dumas v. Schweiker*, 712 F.2d 1545, 1552 (2d. Cir. 1983) ("[D]isability requires more than mere inability to work without pain. To be disabling, pain must be so severe . . . as to preclude any substantial gainful employment."). If the claimant does suffer from such an impairment, at the second step, the ALJ must consider "the extent to which [the claimant's] symptoms can reasonably be accepted as consistent with the objective medical evidence and other evidence" of record. *Id.* The ALJ must consider "[s]tatements [the claimant] or others make about [his] impairment(s), [his] restrictions, [his] daily activities, [his] efforts to work, or any other relevant statements [he] make[s] to medical sources during the course of examination or treatment, or to [the

agency] during interviews, on applications, in letters, and in testimony in . . .

administrative proceedings." 20 C.F.R. § 404.1512(b)(3); *see* also 20 C.F.R. §

404.1529(a).

It is the province of the Commissioner, not the reviewing court, to "appraise the

credibility of witnesses, including the claimant." *Aponte v. Sec'y of Health & Human

Servs.*, 728 F.2d 588, 591 (2d Cir. 1984). If the Commissioner's findings are supported

by substantial evidence, the court must uphold the ALJ's decision to discount a

claimant's subjective complaints. *Id.* (citing *McLaughlin*, 612 F.2d at 704). "When

evaluating the credibility of an individual's statements, the adjudicator must consider the

entire case record and give specific reasons for the weight given to the individual's

statements." SSR 96-7p, 1996 WL 374186, at *4 (S.S.A. Jul. 2, 1996).

Here, applying the first step, the ALJ found that Zokaitis's medically

determinable impairments could reasonably be expected to produce the symptoms

alleged. (AR 58.) At the second step, however, the ALJ concluded that Zokaitis's

statements concerning the intensity, persistence, and limiting effects of these symptoms

were not credible to the extent they were inconsistent with the RFC to perform light

work. *Id.* In so concluding, the ALJ considered evidence relevant to considerations

under 20 C.F.R.§ 404.1529(c)(3), including Zokaitis's "subjective complaints" (AR 59),

her "symptomatic complaints a[s] characterized in her hearing testimony and in the

evidence of record," and the Disability Report Zokaitis filled out on November 16, 2006.

(AR 58). Upon consideration of the entire case record, however, the ALJ simply

concluded that Zokaitis's subjective complaints were not credible because they lacked

consistency with other information in the record.  The ALJ gave specific reasons for

failing to assign great weight to Zokaitis's subjective complaints.  In particular, he

observed that the purported debilitating nature of Zokaitis's symptoms was not consistent

with evidence of her daily activities, which the ALJ described as "broad," including

caring for three children, driving them to school, attending appointments, attending

school meetings, and regularly using a computer.  (AR 58-59, 355.)

    After reviewing the record, substantial evidence supports the ALJ's conclusion

that there is little or no objective medical evidence which supports that Zokaitis's

symptoms cause her to be unable to perform light work.  As noted earlier, the medical

records of Drs. Peraza and Lazarovich suggest that Zokaitis's skin condition can be

controlled to a degree with appropriate medication (AR 188, 279, 466), and neither

doctor performed objective tests to assess the degree to which Zokaitis's ability to do

light work was adversely affected by her condition.  Likewise, Driscoll's and Small's

treatment notes also indicate that regular counseling and compliance with medication

regimens help Zokaitis control the symptoms of her psychological conditions.  (AR 243,

244, 302-04, 380, 383, 386.)  All of this evidence, taken together, undermines Zokaitis's

contention that she is unable to perform her prior work.

    Zokaitis's reliance upon *Genier v. Astrue*, 606 F.3d 46 (2d Cir. 2010) in support

of her argument that the ALJ erred is misplaced.  In *Genier*, the ALJ applied the same

two-step process discussed above for evaluating a claimant's assertions of pain and other

limitations, but the Second Circuit held that the ALJ erred in his credibility

determination.  *Genier*, 606 F.3d at 49.  At the first step, the ALJ concluded that the

claimant's medically determinable impairments could reasonably be expected to produce the alleged symptoms; at the second step, however, the ALJ concluded that the claimant's statements concerning the intensity, persistence and limiting effects of his symptoms were not credible to the extent that they were "inconsistent with the . . . evidence of record." *Id.* at 50.

In concluding that the ALJ erred, the Second Circuit stated that the ALJ's credibility determination "was based on so serious a misunderstanding of Genier's statements that it cannot be deemed to have complied with the requirement that they be taken into account." *Id.* The Second Circuit elaborated upon specific examples of the claimant's statements and testimony regarding his daily activities which the ALJ mischaracterized in his decision. *Id.* For example, the Second Circuit found it significant that the ALJ stated that the claimant "indicated in a questionnaire . . . that he was able to care for his dogs, vacuum, do dishes, cook, and do laundry," when, in fact, the claimant had indicated that he "tried to" do these things but that he required the assistance of a parent because of his severe fatigue. *Id.* Based upon this and other misinterpretations of the evidence, the Second Circuit concluded that "[b]ecause the ALJ's adverse credibility finding, which was crucial to his rejection of Genier's claim, was based on a misreading of the evidence, it did not comply with the ALJ's obligation to consider 'all the relevant medical and other evidence,' 20 C.F.R. § 404.1545(a)(3), and cannot stand." *Id.*

In this case, no such misreading of the evidence occurred. The ALJ stated in his decision that he considered Zokaitis's subjective complaints but concluded that they were not credible because they lacked consistency with other information in the record. (AR

58.)  This conclusion is supported by substantial evidence and is not based upon a

misreading of the evidence.  Zokaitis's subjective complaints were not only inconsistent

with medical evidence but were also inconsistent with her own reported daily activities.

Zokaitis's own function report states that she is able to "Pick up/Drop off son at

headstart, take care of baby, clean house, go to appointments" and "help with homework

 . . . or school projects." (AR 144.)  She also states that she is able to prepare complete

meals daily.  (AR 146).  Although Zokaitis alleges that her condition first bothered her in

1999, she worked until 2002 without having to work fewer hours, change her job duties

or make any other job-related changes.  (AR 133.)  Zokaitis's reported ability to perform

these daily activities is consistent with the ALJ's reading of the evidence.

　　　While Zokaitis points to other evidence in the record tending to support her

assertions, the ALJ need not give identical weight to all the evidence regarding a

claimant's subjective complaints of pain.  *See Parker v. Harris*, 626 F.2d 225, 231 (2d

Cir. 1980).  Rather, the ALJ must ultimately resolve evidentiary conflicts and appraise

the credibility of witnesses, including the claimant, *see Carroll v. Comm'r of Health and

Human Servs.*, 705 F.2d 638, 642 (2d Cir. 1983), and the Court must sustain the ALJ's

decision as to credibility if it is supported by substantial evidence, even if there is

substantial evidence to support the claimant's position, *see Schauer v. Schweiker*, 675

F.2d 55, 57-60 (2d Cir. 1982).  Here, there is substantial evidence supporting the ALJ's

determination that Zokaitis's subjective complaints were not entirely credible.  The ALJ

applied the correct legal standard in assessing Zokaitis's credibility, and, given the

contradictory evidence, was justified in refusing to accept her statements regarding the intensity, persistence, and limiting effects of her impairments.

## <u>Conclusion</u>

For these reasons, I recommend Zokaitis's Motion (Doc. 5) be DENIED, and that the Commissioner's Motion (Doc. 11) be GRANTED.

Dated at Burlington, in the District of Vermont, this 28th day of October, 2010.

/s/ John M. Conroy
John M. Conroy
United States Magistrate Judge

Any party may object to this Report and Recommendation within fourteen days after service thereof, by filing with the Clerk of the Court and serving on the Magistrate Judge and all parties, written objections which shall specifically identify those portions of the Report and Recommendation to which objection is made and the basis for such objections.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2), 6(a), 6(d); L.R. 72(c). Failure to timely file such objections operates as a waiver of the right to appellate review of the District Court's adoption of such Report and Recommendation.  *See* Fed. R. Civ. P. 72(a); *Small v. Sec'y of Health and Human Servs.*, 892 F.2d 15, 16 (2d Cir. 1989).